For the appellant, we have Mr. Craven. For the appellee, we have Mr. DeVoot. Is that how you pronounce your name, sir? All right, thank you. You may proceed, counsel. Thank you, Your Honor. May it please the Court. Counsel, good afternoon. We're here today on a FOIA case involving a settlement agreement between Wexford and the estate of a Department of Corrections inmate. Obviously, the Department of Corrections has an obligation to provide health care to inmates in Illinois penal institutions, and DOC has a contract with Wexford to provide those services. It's undisputed, I believe, that the provision of those health care services is a governmental function performed by Wexford on behalf of the Department of Corrections. Why would you suggest that? I mean, providing medical care to the prisoners that are in the estate's office. The Constitution is just a mess, Your Honor. I think when we revisit that, we'll take up that issue. Something went wrong, allegedly, in the provision of health care with Mr. Franco, who was a guest of the Department, and Mr. Franco died. His estate filed a claim against Wexford and other individuals, alleging that he was the recipient of improper or inappropriate health care. Clearly a claim related to that nasty constitutional provision to provide health care. That claim was settled between Wexford and the estate, and the Illinois Times now seeks access to that settlement agreement. The Department of Corrections, to its credit, tried to get Wexford to release that settlement agreement both to the Department and to the Illinois Times, but Wexford refused to do so, and after some related and unrelated litigation, we end up here on this FOIA claim. The provision of the contract, there is a provision in the contract that records will be public unless they are marked confidential and exempt under FOIA. I don't know if this particular contract is marked confidential. There is no doubt that the contract between Wexford and DOC establishing the cost of providing health care to inmates is a public record. This settlement agreement relates to the alleged failure to provide health care, and establishing the cost related to that failure, alleged failure, and that contract likewise should be a public record. Both the contract and indirectly this settlement are funded with public dollars. Wexford claims the agreement and the amount to be paid to resolve these allegations is a trade secret, but at the same time, Wexford itself notes a strong public interest in the release of settlement agreements, so that the public gets to know if, in this case, Department of Corrections, either alone or through Wexford, is doing its job. And obviously, the public has an interest in understanding the financial impact on the public body and the taxpayers, including rates for future services, future insurance policies. I can't pretend that the cost of, that the increased cost to taxpayers is because of the cost of these settlement agreements is either hypothetical or theoretical. Watching a football game over the weekend, Liberty Mutual Insurance told me that if you pay the premium plus some, they will give you accident forgiveness insurance. So if you pay your insurance premium, but don't get accident forgiveness insurance, when you get an accident, your fault or not, your premium is going to go up. But if you pay your premium plus up front, then they can't increase your premium when you're in an accident. Mr. Franco was in an accident. We paid to settle that claim, and our cost of doing business, our, the taxpayers' cost of doing business, is going to go up as a result. There is a cost to the taxpayers that is involved in this case. The argument would be made that this agreement is not directly related to the provision of health care. I would argue that it is directly related to the failure to provide health care. The governmental function at issue is to comply with the constitutional and statutory responsibilities of the Department of Corrections. This agreement demonstrates that, doesn't demonstrate because I am sure, I haven't seen it, but my guess in there is, in that agreement someplace, is a paragraph that says Wexford denies all liability, blah, blah, blah. So it's not an admission, but there is payment based on a claim of a failure to provide adequate health care. In the College of DuPage case, which is cited in the briefs, the documented issue was a subpoena not directly related. I mean, in that case, the foundation was doing fundraising for the college. The subpoena had nothing to do with fundraising. The subpoena wasn't an effort on the part of the foundation to go out and raise money for the college. It wasn't a solicitation for funds. It wasn't at all related to the activities of the department. Rather, it was related to the failure of the activities of the foundation. It was related to either wrongdoing or some investigation into the relationship between the college and the foundation, but it was not directly related to the fundraising activities done by the foundation. And yet, the Second Circuit ordered that that subpoena be disclosed pursuant to this same section of the Act. The same conclusion applies in this case. What we have here is a failure... In that case also involved somebody saying, we don't have a copy of the record. That wasn't transmitted by the Vice President for Advancement. The subpoena was issued to the foundation. The employee of the foundation, who was also an employee of the college, took it to another employee of both. And then the foundation says, we don't have it. It exists, but we don't have it. Which is precisely the position that DOC finds itself in this case. It exists. We tried to get it. We don't have it. But this settlement agreement, like that subpoena, deals not with the specific function that was delegated to the foundation or to Wexford. It deals with matters related to that function, related to a failure to perform that function. And like the subpoena in the DuPage case, the agreement in this case should be disclosed. Absent any questions, the policy, I think, is... on what is directly related to the function assigned to Wexford and is an agreement related to a failure to perform that function, disclosable under subpoena 2. I would argue that it is. I don't see any questions at this time, counsel. Thank you. May it please the Court, counsel? Your Honors, Judge Otwell was right in finding that this settlement agreement is not subject to FOIA pursuant to Section 7-2. FOIA is a broad statute, but as this Court and other courts looking at FOIA have said, it has its limitations. And when you look at the provision, this case is about Section 7-2. It's about Section 7-2 in front of Judge Otwell. Counsel's brief identifies Section 7-2 in this notion of a document in the possession of a third party contracted to perform a service, and whether or not that specific document directly relates to the government service being provided. And Your Honors, FOIA, the statute draws a clear line between the disclosure obligations of a public body and the disclosure obligations of a third party, of a non-governmental body. And it does it throughout the statute. And as this Court has said, when trying to understand the statute as a whole, so as not to render any words superfluous. And so I think the first place to start is to look at the example, one of the examples of future in a brief. When you compare the obligations of a public body as set out in the definition of public record of 2C as compared to the definition in 7-2 related to a third party. And 2C talks about a public record need only pertain to the government business. And when you see that as compared to when you're talking about 7-2, the standard here, a document that directly relates to the performance of that governmental function. And this Court, I know, is very familiar with FOIA, and in each of those cases, this document-by-document analysis matters. And as Judge Otwell found, this particular document does not directly relate. Does the settlement agreement at issue in this case involve the settling of a claim arising out of the rendering by your client of medical care? Your Honor, yes. The backdrop of the settlement agreement is there was a lawsuit, and the lawsuit involved a provision of medical care. And there's no question that there will be documents in the course of that litigation that do directly relate. I think that's one of the best places to start when you look at the actual settlement agreement. And counsel's client does have a copy of the redacted version, and I know your Honors have the unredacted version. That document has no description, no discussion. It doesn't provide any information regarding the actual condition of this individual, of treatment, of policies and procedures employed, of tests, of medication. None of those things. And similarly, no analysis whatsoever of anything. Does it relate to the service that your client was providing? Your Honor, the document does not directly relate to the service provided. The document, as Judge Otwell found, memorializes a business decision to settle the case. Your Honor, I know this Court from its own experience has seen hundreds of cases where parties settle cases all the time for all kinds of different reasons. And as your Honors know from those cases, those documents often contain very little other than reflecting the party's ultimate conclusion that they want to settle a claim. Had it not been for your client's contract to perform certain services for the Department of Corrections, would this agreement ever have come about? Your Honor, it is definitely true that no, that is correct. So your answer is yes or no? The answer is that the lawsuit came about, yes, because of the contract and the provision of care. But, Your Honor, I think that's where it's important to this initial idea of having a lawsuit, where the backdrop is the health care. But as FOIA commands, when we look at the specific document, it's a document-by-document analysis. This Court has had cases where they had to look at the FOIA exception where we don't produce personnel files. But as this Court said, there were individual employment contracts in there that didn't qualify to be a part of that personnel file. And if we don't do a document-by-document analysis, it really does upset the balance that the legislature drew between a private party's disclosure obligations and the disclosure obligations, Your Honor, of a public body. Of course, there are exemptions, but the only exemption you refer to is the fact that you're saying that it does not directly relate to a governmental function, correct? I mean, are you asserting any other exemption or privilege? No, that's right, Your Honor. And, Your Honor, I think that it's key to contrast those. If you hold up 2C and you hold up 7-2, the legislature made the decision to draw a difference between those disclosure obligations. And I think that that's where this case starts, and actually looking at this particular document, as Judge Otwell did, there are absolutely documents that do, in fact, directly relate. We have other cases where we have policy manuals, Your Honor, or procedure manuals, and an inmate will request those documents. Those documents actually related to the provision of care. But this is a document that simply settles that claim. And, again, I think if you just go back to that document, there's no mention whatsoever of any aspect or any discussion as to whether or not it relates to the provision of care. And Mr. Craven's right. There is a specific disavowal that the document is anything other than settling the claim. And so, Your Honor, it's absolutely true that there are many documents. If you go to Stateville Prison, and you go to the Medical Records Department, and you go to an individual inmate's file, there will be notes from a Wexford doctor. There will be test results ordered by a Wexford doctor. There will be prescriptions provided by a Wexford doctor. All of those obviously directly relate to the provision of care. But there is a distinction that the legislature determined and made between the reporting obligations that pertains to analysis for 2C for public bodies and this notion of a document having to directly relate. And, Your Honor, in terms of Mr. Craven talked a little bit about funding, you know, throughout this litigation, Mr. Craven had suggested in this section 2.20 was implicated in this case. And as Your Honors know, that's the section that specifically says a settlement agreement by or on behalf of a public body is subject to FOIA. And Mr. Craven, after he made that assertion, and we pointed out that every case that he cites actually involves a public body, and that there's not a single public access opinion, not a single case, not a piece of legislative history suggesting that 2.20 is implicated in this case. He's now backed away from that, but the important part is he made the same argument there that he's made now about funding, the argument that Judge Otwell considered and rejected. And that argument was this notion that because of a settlement agreement, a private business decision to settle this case will cause a future cost to future contracts. As Judge Otwell noted, he... Is that the only consideration? Your Honor, no. Financial? Your Honor, from... Well, but I'm asking if that's the only consideration. In terms of consideration by... All we care about is the cost? No, Your Honor, absolutely not. That's what you're suggesting. Respectfully, Your Honor, I don't mean to suggest that. What I'm suggesting is that, in fact, I'm just trying to address the argument that the public, because the public has an interest in future costs to the state, the argument goes, if there's a settlement agreement, the settlement agreement will increase future costs to future contracts. And Judge Otwell said, look, I think that's a good policy argument for the legislature, after considering the argument. But he noted two important problems with that argument that is being made again here in terms of the financial component. And the two arguments are, Your Honor, number one, it's speculative because there's not even certainty that there will be another contract with Wexford. There's an RFP out right now for a new vendor. And second, and more importantly, Your Honor, this notion that... How does the Department of Corrections in the state of Illinois evaluate RFPs if they don't know what's in that settlement agreement? And you can assert that it's really just a summary that, okay, we're going to settle this, but we don't admit any liability. How can I properly consider an RFP or decide that I want to continue to do business with Wexford if you won't give me that settlement agreement? And by me, I mean the Department of Corrections, the state of Illinois, those bodies that deal with treatment, that deal with the state of Illinois, and mental health facilities, if we were in federal court, and I don't profess to have any notion about FOIA and what restrictions there might be, but the whole state of Illinois is in a state of furor over the mental health treatment, which is medical, being provided in the state prisons. And I can't imagine you telling a federal judge that if you were going to... We're going to settle this, because the guy committed suicide, but we're going to settle the case. That that settlement agreement wouldn't be a part of that lawsuit and be revealed. If the court was saying, I'm going to tell you, state of Illinois, you better start providing better mental health care to your inmates, I would think that would be a critical thing to be disclosed, that you settled a case for whatever reason, maybe the reason's in the settlement agreement, maybe it's not, for a court to see it. Well, Your Honor, I think taking a step back, when we're talking about the oversight of a regulation of Wexford vis-a-vis IDOC, there are absolutely policies and procedures in place for IDOC that they do, in fact, review all of Wexford's provision of care, Your Honor. And to be clear, IDOC never, during the course of its provision of care to its inmates, has ever asked for this settlement agreement. They didn't even know it existed until it came up in the context of a FOIA request. But, Your Honor, to be clear, I think it's important to put it into the context of the tapestry of, there are many different, if an inmate passes away, for example, Your Honor, there's absolutely a death review that takes place between IDOC and Wexford and the inmates, or the physicians from Wexford. So, but I think the important point is that FOIA does have limitations. It certainly, as the statute says, is to shine a light on government function, but there is, in the statute, there is a limitation drawn when it comes to the private parties, along with other exemptions, like the trade secret exception, Your Honor, for example. And I'm not raising that for this particular case, but the policy behind the trade secret exemption for private vendors, just like here, just like they say in the Tribune case, that just because you sign up to provide a government function doesn't mean that the general public gets to look at every single document, as the Second Circuit, excuse me, the Second District said. And the important point here is, there's absolutely oversight over Wexford, vis-a-vis IDOC, and in those lawsuits themselves, Your Honor, but the notion that this settlement agreement under FOIA, the issue here, directly relates to the provision of care, this particular document does not, respectfully. And I think it doesn't, isn't every bit of care that's provided by Wexford involved business decisions? Just the care of patients. You make a choice between this medication and that medication, the cost of this medication, the cost of that medication. It would seem to me that, under your argument, none of that would be resolved, because we're just making business decisions, but we're doing our best to try to provide appropriate medical care for the inmate. Respectfully, Your Honor, absolutely not. Well, I agree, absolutely not, but what I'm trying to do is make the connection. What's the connection? The connection, Your Honor, the legislature has made the connection for us by saying that the document has to directly relate to the provision of care, as opposed to, when you look at 2C, it just says it has to pertain to the conduct of public business. And, Your Honor, I think it's important to recognize, I would like to address the Tribune case, they didn't have the subpoena. I would like to get to this discussion of the subpoena in the Chicago Tribune case. I think it's really critical. Mr. Craven decided both the Tribune case and the charter school's public access opinion. If Your Honors look at those two cases in the Tribune case, there was no discussion whatsoever by the College of DuPage or its foundation. The court specifically said that they never tried to assert and make any arguments whatsoever about whether or not they were directly related. In fact, there's no discussion of the contents of the subpoena. I'm not really sure where that description came from, and that's critical. The College of DuPage, there's no analysis of the actual subpoena, as opposed to the document here. So, respectfully, I don't think that that characterization is helpful. Instead, what is helpful from the College of DuPage case is the second district's acknowledgement that the language that it must directly relate, just comparing the words pertain versus directly relate, just looking at the statutory, it has to mean something. There has to be a difference there, or else it just renders directly relate superfluous. And in this instance, this is an example. There are absolutely many documents, Your Honor, to your point, many documents that directly relate to the provision of care. Many documents. As I said, if you walked into a medical records room or a doctor's notes, all of those different documents, they actually relate to the care. The term directly relates is not statutorily defined, and is going to have to be determined on a case-by-case basis, given the purpose of FOIA and how this Court and others have said it should be liberally construed. Why shouldn't we liberally construe it in this case to provide the plaintiff with what he wants? Yes, Your Honor. I think because in this case, it is absolutely the case that's not statutorily defined. It is a case-by-case. I agree, Your Honor, and I would ask Your Honors to look at the document again and look at the settlement agreement. And although the Court is charged with liberally construing it, this Court has also said it has its limitations. And in this instance, there is a balance that has been struck by the legislature to balance the interests of a private vendor. The State of Illinois wants private vendors who want to do business with the State of Illinois. And Mr. Kravitz talked about policy. There are also policy considerations. I don't think they're necessary because of the text, but to your question, Your Honor, the State of Illinois, the legislator who wrote the trade secrets exemption said, the term trade secrets is to be liberally construed because we want to attract vendors who want to do business with the State. And that is exactly the case throughout, that there are these lines that are drawn. And so while I think there are certain instances, particularly when dealing with the public body, that this Court should take into account this balance that the legislature has tried to strike. And I would just note, Your Honor, 7-2 existed when in 2010, Section 2.20 was drafted. 7.2 was in place, and 2.20 was enacted in 2010, where they specifically decide at that point to identify that settlement agreements on behalf of or by a public body are in fact covered by FOIA. And it does not cover private parties. There's no case, there's been no suggestion that it covers those. And I think that's telling when, Your Honor, when you're thinking about how to construe the statute, going back to statutory construction, when you take the combination of even with the charge to interpret it liberally, when you look at 2C, Your Honor, and you look at 7.2 and the difference there, and then you see 2.20, that is the legislature effectuating their own policy determination. And what they're effectuating is a narrower interpretation? Yes, Your Honor. That benefits the private vendor. Yes, Your Honor. Because they want to do business with the private vendor. Yes, Your Honor. Because the State of Illinois does rely on a number of vendors to provide services. And I want to be as clear as I can, Your Honor, to your good question before. This is no attempt to escape oversight. There is more oversight than you could possibly imagine with respect to IDOC over Wexford, not to mention Wexford over its own doctors. And there are many documents that absolutely, positively, directly relate. It is respectfully, Your Honor, our position, though, in this case, as Judge Otwell found, in announcing that he is in favor of the First Amendment, I think his quote was, and values transparency, that this particular document, specifically, does not directly relate to the provision of care. Tell me why you take this position. Even if this is a legally correct position, you've asserted that in this case, the unredacted version doesn't really say much extra that anybody would be interested in. So why not disclose it? Absolutely, Your Honor. And I want to be clear. I think that there are absolutely policy arguments here that, although I don't suggest to rely on them, but I would say there, to answer your question, vendors across the state, if the court were to interpret FOIA statute such that it's not just Wexford, it is any vendor that has a private settlement agreement with this business decision and to settle it for a monetary amount, there are specific examples of how that will increase litigation with respect to those vendors. Why? Well, Your Honor, in the specific context of, I can speak to with prisoners, that our client's experience has been that it has always gone up after there is, if there's knowledge that there's been a monetary settlement for a case. You mean the prisoners don't know there's been a settlement and this is going to be a newsflash to them? I think, Your Honor, for example, the amount, I think that they've settled a dollar amount. They're also, Your Honor, it's not just the vendor. I'll start specifically with health care. The vendor relies on their own providers. And as Your Honors know and have read, there is, for example, just a public health study here in downstate Illinois about, in rural areas, the acute shortage of primary care physicians, Your Honor. That wasn't by Wexford, right? Primary care physicians and mental health providers. And if there was an increase in lawsuits, corrections is already a challenging environment, as we all know. And they have a heck of a time recruiting those individuals to provide care in those facilities and spend literally millions of dollars and pay hundreds and hundreds of thousands of dollars to try to get psychiatrists to go to Stateville to try to get doctors when there's already a shortage nationally of those doctors. And by making private documents about these monetary settlements public, increasing those cases, you make a challenging job of not only recruiting vendors to the state, but also individual providers for those vendors to the state. And that actually hurts the people of Illinois. How is a vendor hurt by releasing the information sought in this case? Well, Your Honor, in this specific case, as I said before, if a release with a dollar amount, in this case there would absolutely be an uptick in litigation. Some of those cases are just fine. I don't understand why. The prisoners already know that there's been a settlement, so we don't know the exact amount. And for all we know, prisoners contemplating bringing a lawsuit might very well evaluate that the settlement was greater than it in fact was. How would we have any way of figuring out that they would be surprised at the actual settlement amount? Your Honor, I see that my time has expired. Your Honor, because in this case, as Your Honor knows, parties settle for all kinds of different reasons. And in this case, the dollar value is such that I think that in fact to anyone, to an inmate, that there would be the motivation to sue. And in that case, to sue not only Wexford the vendor, but also the individual doctors at their facility. And it would present a challenge to Wexford both in terms of the number of lawsuits they face, and also the number of lawsuits that the individuals face. And I think, respectfully, I think this is a problem that does create a slippery slope for all private vendors, and ultimately could end up hurting the state of Illinois. For all those reasons, I would ask Your Honor to respectfully affirm Judge Iwell's decision. Thank you, counsel. Any rebuttal, Mr. Craven? Although I should have learned by now, yes. And while there are healthcare concerns, obviously I think we've now decided, or been instructed, that the only thing that we don't know about this settlement agreement is either four or five or six or seven figures. Funded, in this case, by Wexford or an insurance company, but funded ultimately by the taxpayers. There is a public interest in knowing that. Maybe we could spend that three or four or five or six or seven figures and hire more doctors, hire more psychologists, hire more psychiatrists. Don't spend it on settlement agreements. Spend it on the provision of healthcare, which apparently failed, allegedly. Mr. Franco, in this case. To follow up on Your Honor's question, how can DOC review and consider responses to an RFP when we don't, we, whoever we is, when we don't know how much Wexford has paid to settle a variety of claims over the life of that contract? We learned in the campaign that we, the state of Illinois, wasted a billion dollars paying interest on claims, on bills that we didn't pay. How much did we waste on settlement agreements with Wexford and the Department of Corrections that could be used for higher and better purposes? And lastly, my colleague is correct that the DuPage case didn't consider, the parties didn't specifically argue whether that subpoena was directly related to the governmental function. The second district ordered that it be released because it was. They had no other basis to order the release of that document other than Section 7-2. Some of this involved the intertwining of the foundation with the governors of the university. Yes. But the foundation got the subpoena and gave it to the university or the college. And the college didn't give it back. And the college was ordered to disclose it. It was a record given to, not the college, but given to the foundation. And it was ordered disclosed. It's a pleasure. Thank you very much.